# EXHIBIT 1

Case 1:21-cv-00078-DKW-KJM   Document 24-9   Filed 11/01/21   Page 1 of 85   PageID #:
Case 1:21-cv-00078-DKW-KJM   Document 99-3   Filed 03/15/22   Page 2 of 19
505
PageID.2081

# Expert Report

# of

# J. Bushnell Nielsen

# in

*First American Title Ins. Co. v. GS Industries, LLC*

**U.S. District Court, District of Hawai'i Civil Case 1:21-cv-00078**

Prepared for:
Michael C. Bird, Esq.
Watanabe Ing LLP
999 Bishop Street, Suite 1250
Honolulu, Hawaii  96813

**EXHIBIT "6"**                                                          EXHIBIT 1

I.   Introduction

This is a report of my expert opinions on behalf of First American Title Insurance Company ("First American") in the above-captioned action. In this report, I evaluate and opine on the conclusions reached by First American as to policy coverage for the claim made by GS Industries, LLC ("GS Industries").

I express my opinions by comparison to the customs and practices of the title insurance industry and the terms of art used by title insurers. All of my opinions are stated to a reasonable degree of certainty.

In forming my expert opinions, I have relied on the documents, treatises, and other sources recited in this report and those that are identified in Exhibit 1 to the Appendix hereto. One of those treatises is the book I wrote, *Title and Escrow Claims Guide*.[1]  My opinions are also based on my work experience as a title officer and title insurance claim administrator; my research and writings on these subjects; and other relevant experience and training as described in my curriculum vitae, which is Exhibit 2 of the Appendix. My prior experience in testifying as an expert witness from 2000 to present is recited in Exhibit 3 of the Appendix.

I reserve the right to modify or supplement this report, and the opinions expressed herein, based on new information or developments, including new information that may be produced in ongoing discovery in the case.

II.  Facts

I have derived the following facts from the documents I reviewed. I have identified any assumptions that I have made about the facts.

A.   The Property

This action concerns a parcel of real estate having a street address of 620 Waipa Lane in Honolulu (the "Property"). The following is a tax parcel map showing the Property and adjoining parcels.

---

[1] J. Bushnell Nielsen, *Title and Escrow Claims Guide*, 2021 Edition, American Land Title Association (hereafter, "*Title and Escrow Claims Guide*").



The issues in this case concern ownership of and GS Industries' rights in the portions of Waipa Lane that are labeled in the above map as Parcel 86 and Parcel 91, which are outlined in purple and aqua (the "Privately-Owned Waipa Lane Segments").

GS Industries purchased the Property in March of 2016.[2] GS Industries' tenant, Cedar Assembly of God church is and was in possession of the Property, both on the date of the purchase and today.[3]

**B.     The Policy**

First American issued a 2006 form American Land Title Association owner's policy of title insurance, insuring GS Industries' title to the Property, with a Date of Policy of March 23,

---

[2] FA000012; FA000028.

[3] FA000028; FA000008.  See http://www.cedaraog.com/.

3

2016, having an Amount of Insurance of $3,500,000, as policy number 5011415-17155 (the "Policy").[4]  The Policy was issued by First American's agent, Title Guaranty of Hawaii Inc.

The Policy insured GS Industries as having title to three parcels in fee simple, as described in Schedule C of the Policy.  The Policy did not contain an endorsement affirmatively insuring a right of access onto any named public street, or insure any access easement right in Schedule C.

The lease rights of Cedar Assembly of God church are recited at Exception 7 in Schedule B of the Policy.

### C. Cedar Assembly of God Building Permit Application

In August of 2019, GS Industries' tenant, Cedar Assembly of God church (the "Church"), applied to the City and County of Honolulu, Department of Planning and Permitting for a permit to build transitional housing.[5]

On October 4, 2019, the Department of Planning and Permitting issued a Notice of Incomplete Application in regard to the permit application.[6]  The Department said that one reason the permit could not be processed at that time was that the Church had not established that the Property had a legal right to use Waipa Lane for vehicular exit to Vineyard Boulevard.  The Department of Planning and Permitting asserted that "a portion of Waipa Lane is privately owned."

GS proposed to purchase an interest in Waipa Lane to assist the Church in obtaining a permit for construction of transitional housing on the Property.[7]

### D. The GS Industries Policy Claim

On October 22, 2019, GS Industries' counsel Kenneth K.P. Wong sent a claim notice to First American by e-mail, claiming that the Property lacked a right of vehicular access.[8]  The claim was based on the assertions that Vineyard Boulevard is a one-way street, and a portion of Waipa Lane is located on privately-owned property in which GS Industries has no ownership.  Specifically, Mr. Wong asked First American to reimburse it for all expenses that GS Industries would incur in the purchase of a one-ninth interest in the Privately-Owned Waipa Lane Segments, including its closing costs and the premium for a title insurance policy on that interest.

---

[4] FA000001-16.

[5] FA000098.

[6] FA000098-100.

[7] FA000040.

[8] FA000017.

4

First American acknowledged receipt of the claim notice by a letter dated October 28, 2019, which advised Mr. Wong that Claims Counsel Amy E. Starrett had been assigned to the claim.[9]

Ms. Starrett issued a coverage determination letter to Mr. Wong on January 28, 2020.[10] She noted that, in First American's claim investigation, it had learned that the Privately-Owned Waipa Lane Segments were originally owned by the state as a remainder parcel.  By a 1956 resolution, the city designated Waipa Lane as a one-way street, likely due to its narrow width.  She determined that this designation, and the Revised Ordinances of Honolulu defining and limiting the use of one-way streets, were an exercise of the city's police powers.  She observed that Exclusion 1 of the Policy excludes from coverage the effect on the Property of governmental regulation of the use of the Land, and governmental police powers.  Ms. Starrett concluded that any loss caused by the city's regulation of the use of Waipa Lane was excluded from Policy coverage and was not payable as a Policy loss.  Thus, First American would not pay to acquire a one-ninth interest in the Privately-Owned Waipa Lane Segments, although it had no objection to the insured's purchase of same.  She stated that First American did not waive the right to assert any other Policy terms as additional grounds for denial of the claim.

By a letter dated March 5, 2020, attorneys Alan Van Etten, Tristan S.D. Andres and Monika M. Wurlitzer of the Deeley King Pang & Van Etten law firm wrote to Ms. Starrett seeking reconsideration of the coverage determination.[11]  They asserted that an insured would reasonably expect the Policy to assure a right of vehicular access to the Property, and that no such right existed.  As authority, they cited the 1979 *Marriott* decision from North Carolina and an unpublished New Jersey decision.  They also asserted that Exclusion 1 was "inapplicable."  They also asserted that First American was required to "cure the defect" of the claimed lack of a right of access.  They clarified that they did not expect First American to cause Waipa Lane to be designated a two-way street, but only to "cure the privately owned portion of Waipa Lane… ."  They recited a "preliminary listing of damage suffered" by GS Industries to date, including the cost to purchase an interest in the Privately-Owned Waipa Lane Segments, construction delays, professional fees in obtaining necessary permits, loss of income from the apartments, and the cost to run utility services to the proposed apartment buildings.

Ms. Starrett replied to the March 5 Deeley King letter by a letter dated April 2, 2020.[12] She informed the lawyers that the Church was not the insured under the Policy, and was not entitled to Policy benefits.  She also explained that the Policy is a contract of indemnity, and did not obligate First American to "discover" the limitations on the use of adjoining Waipa Lane as asserted in the March 5 letter.  She further concluded that Covered Risk 4 of the Policy was not invoked, because the term "access" is not ambiguous, and that coverage did not assure a right of vehicular access to the Property.  She quoted from the *Woody Creek* and *Riordan* decisions in support of her position.  She also noted that later courts have consistently held that the *Marriott*

---

[9] FA000018.

[10] FA000019-26.

[11] FA000027-46.

[12] FA0000175-181.

5

"reasonable access" holding was both incorrect and mere dicta. She further noted that the actual holding in *Marriott* was that there was no coverage for the lack of a vehicular right of access due to the policy's police power exclusion, on which Ms. Starrett had relied in her coverage determination. Ms. Starrett further stated that the Policy did not insure any ownership right in the Privately-Owned Waipa Lane Segments. No such right was affirmatively insured in Schedule C and the Policy definition of "Land" states that the Policy does not insure any rights the insured may have in an adjoining street. She also amplified her prior conclusion that Policy coverage was barred by Exclusion 1, and responded to the claimed authority cited in the March 5 letter concerning that exclusion.

The Deeley King firm replied to Ms. Starrett's April 2 letter by a letter dated July 24, 2020.[13] That letter reiterated the positions stated in the March 5 letter. In addition, they argued that, although the Church was not the insured under the Policy, First American should be found liable for losses suffered by GS Industries due to the demands made on it by its tenant, the Church.

Ms. Starrett responded to the July 24 letter by a letter dated August 4, 2020.[14] She explained that the lease with the Church was excepted in the Policy. Thus, any claimed loss suffered by GS Industries due to its breach of the lease terms was excluded from Policy coverage due to Exception 7. She concluded that the July 24 letter had not caused First American to alter its conclusion that the Policy afforded no coverage for the subject of the claim. However, Ms. Starrett stated that, despite the lack of Policy coverage, First American was willing to "engage in mediation" with its insured.

On January 14, 2021, Jordan Dildy of the Department of Planning and Permitting sent an e-mail to Aimee Hui stating that he was confirming that the Department would accept the determination that Waipa Lane is a public road and may be used by the public.[15] Hui replied, asking Dildy to confirm that he meant the Privately-Owned Waipa Lane Segments. Dildy replied in the affirmative, "because it is maintained by the City."

Ms. Starrett wrote a letter dated January 26, 2021 to attorney Van Etten, informing him of the Dildy e-mail.[16] She stated:

> Here, DPP has concluded that Waipa Lane is available for public use and that there is no longer any condition to GS's tenant's application attributed to rights within Waipa Lane. As such, the matter for which coverage was sought under the Policy no longer exists.

---

[13] FA000182-186.

[14] FA0000187-188.

[15] FA000189.

[16] FA000191-192.

6

Mr. Van Etten sent an e-mail to Ms. Starrett on January 26, 2021.[17] He asserted that her characterization of Mr. Dildy's e-mail was "misleading," and asserting that the public access across Waipa Lane "is conditional and can be revoked at any time."  He attached an e-mail in which Dildy stated that the Department of Facility Maintenance maintains the private portion of Waipa Lane pursuant to Section 14-32, Chapter 14, Revised Ordinances of Honolulu.  Dildy also stated that the Department does not determine if there is public access, but "because the DFM does maintain the road, it provides a reasonable assumption that the road is open to, serves, and benefits the general public."

Ms. Starrett responded to Mr. Van Etten by a letter dated February 1, 2021.[18] She concluded that the Department of Planning and Permitting no longer required proof of a right to use Waipa Lane as a condition to the granting of the permit to the Church, and therefore there was no present adverse claim relating to the right of access to the Property.  She also cited additional authority for the principle that any claimed lack of a right of vehicular access to the Property would not invoke Covered Risk 4.  She also noted that any future possible challenge to access would be based on the potential overburdening of Waipa Lane due to the planned development of the Property, and that such an overburdening claim would invoke Exclusion 3(d), for matter that attach or are created after the Date of Policy.

### E.      Filing of This Action

First American filed its Complaint (Dkt. 1) this action on February 8, 2021, seeking a declaration from the Court that there are no Policy benefits payable to GS Industries and that First American has acted in good faith toward its insured.  On March 4, 2021, GS Industries filed its Answer with affirmative defenses and asserted a Counterclaim (Dkt. 9) against First American seeking a declaration from the Court as to First American's duties under the Policy, including a declaration that it must pay insurance benefits to GS Industries to remedy the lack of a right of access to the Property and that GS Industries is entitled to its attorneys' fees and costs.

## III.   Expert Opinions

The following are my expert opinions in this matter.

### A.      The Limits of the Generic Policy Coverage Concerning a Right of Access

It is my expert opinion that First American has followed standard industry custom and practice in its analysis of the limits of the right of access coverage found in the Policy.

Covered Risk 4 of the Policy is limited to indemnification of GS Industries only if there is "no right of access to and from the land."[19]  Courts have consistently held that the term "right of access" is unambiguous.  Most commonly, a court will rely on a definition of the term as found in state statutes, court decisions or a title insurance treatise.  For example, in the very

---

[17] FA000195-196.

[18] FA000200-201.

[19] This covered risk is discussed in *Title and Escrow Claims Guide,* § 9.7, *Right of Access*.

7

recent decision of *Community Bank v. Fidelity Nat'l Title Ins. Co.*, ___ F.Supp.3d ___, 2021 WL 3130585 (W.D.Pa. 2021), the court adopted the following common sense definition, based on court decisions and a title insurance book:

> [L]egal right of access is defined as "the right of reasonable ingress and egress" to and from one's property. See *Dep't of Transp. v. Richards*, 556 A.2d 510, 513 n.7 (Pa. Commw. Ct. 1989) (citing *Breinig v. Allegheny Cnty.*, 2 A.2d 842, 847 (Pa. 1938)). "Such right of access does not entitle the abutting owner to access to all points" of the property. See *Wolf v. Dep't of Highways*, 220 A.2d 868, 871 (Pa. 1966). In other words, "[w]hile standard...title insurance policies insure a legal 'right of access,' it is important to understand they do not insure any particular physical route." See Joyce Palomar, 1 *Title Ins. Law* § 5.8 (2020 ed.) (August 2020 update).

The *Community Bank* court also held that the term was not ambiguous, and that it was not susceptible to the doctrine of reasonable expectations.

The *Community Bank* definition of right of access is identical to that stated in my book, which says "[a]ccess commonly means the right to travel to a public street, directly or indirectly."[20] Thus, Covered Risk 4 is invoked only if the insured parcel lacks any means of entering the insured parcel from a road, either directly from an abutting street or indirectly by crossing privately-owned land.[21]

The access coverage in Covered Risk 4 is not expansive; the drafting of this limited access assurance is deliberate, as my book explains.[22] Many parcels in the United States enjoy only a very limited right of access. The Policy was written so that the access coverage could be given for most parcels in the United States, despite the fact that many have a right of access that is less than what would be deemed standard for urban residential parcels.[23]

Further, the Policy does not assure that the right of access will be of any particular type. A leading case involving a resort located in a remote location held that Covered Risk 4 assures a "generic" right of access. In *United Bank v. Chicago Title Ins. Co.*, 168 F.3d 37 (1st Cir. Me. 1999), the insured parcel was a resort situated on a lake. Access from a public street was over a 17-mile-long logging road that traversed several private owner's property. Six miles of that roadway ran across property that formerly had the benefit of an access license, but the license had lapsed before the policy date. The insured held an in-force revocable license over the balance of the logging road. The court held that Covered Risk 4 was not invoked due to the fact that the insured did not hold a recorded, permanent access easement. The court said that access

---

[20] *Title and Escrow Claims Guide* § 9.7, *Right Of Access*, at 9-58.

[21] See *Title and Escrow Claims Guide* § 9.7, *Right Of Access*.

[22] See *Title and Escrow Claims Guide* § 9.7, *Right Of Access*.

[23] *Title and Escrow Claims Guide,* § 9.7, *Right of Access.*

over the logging roads, with or without written licenses, did not invoke policy coverage or obligate the insurer to obtain a better access right for the insured.

Further, the Policy does not assure that the right of access will be found adequate for the issuance of a permit. I say this in my book:

> Absent a specific affirmative access coverage, the ALTA policies do not indemnify the insured against any limitation on the right of access by ordinances or permit powers regulating an adjacent street, or a private restriction on the use of the street. For example, a municipality's refusal to issue a driveway permit to the insured was an exercise of the police power. The police power exclusion thus places an implicit limit on the scope of the access coverage.[24]

In addition, the "generic" access right coverage does not assure that access will be in any particular location. The generic access coverage also does not contain the assurance that the access path has any particular qualities, or is free of limitations, especially those imposed by a governmental body. Thus, it is my expert opinion that First American accurately informed GS Industries that the Policy does not assure GS Industries that it has vehicular access over a particular route, or that the access route is free of limitations.

The Policy assured GS Industries that, on the Date of Policy, it had a right to travel from a public street onto the Property. The Property has that right. It directly abuts Waipa Lane, which in turn connects to Vineyard Boulevard. GS Industries did not assert that people traveling to the Church had been denied the right to travel from Vineyard Boulevard to Waipa Lane and then onto the Property.[25] Thus, it is my expert opinion that the insured generic right of access to the Property existed on the Date of Policy and has never been invoked.

It is also my expert opinion that the question initially raised by the Department of Planning and Permitting concerning Waipa Lane did not invoke Covered Risk 4,[26] and that First American accurately noted that the Department's review of access was in the exercise of its police powers, a subject excluded from coverage, as my book states.[27] The Department was reviewing the nature and quality of the Property's access rights in relation to a permit application seeking to develop the property and increase traffic onto the adjoining streets. As part of that review, the Department required the Church to deliver evidence that the Privately-Owned Waipa Lane Segments are a public road. The Department never blocked the Church from traveling over Waipa Lane; nor would it have had the right to do so. Further, of course, the Department later became satisfied that the road was public because the City of Honolulu has maintained the road,

---

[24] *Title and Escrow Claims Guide,* § 9.7.2, *Effect of Private and Public Restrictions on Right of Access* at 9-72.

[25] See FA000017 (October 22, 2019 claim notice); FA000027-46 (March 5, 2020 letter); FA000182-186 (July 24, 2020 letter); FA000195-196 (January 26, 2021 email); GS Industries' Answer to Complaint and Counterclaim filed on March 4, 2021 (Dkt 9).

[26] See FA000098.

[27] *Title and Escrow Claims Guide,* § 9.7.2, *Effect of Private and Public Restrictions on Right of Access* at 9-72.

9

though it is privately owned. It then withdrew its demand for proof that Waipa Lane was a public road as a condition to the issuance of the permit.[28]

It is also my expert opinion that Covered Risk 4 was not invoked by the insured's own later assertion that the owners of the Privately-Owned Waipa Lane Segments *might* block access in the future, which has not occurred. Those owners have never taken any such action in the many years in which the Church has used Waipa Lane. Nor would such a claim be credible, given the fact that the owners have turned over the maintenance of the Privately-Owned Waipa Lane Segments to the City of Honolulu.[29] In any event, numerous courts have recognized the principle that a title insurer need not act to "cure" a claimed title issue when the only party attacking the insured's title is the insured.[30]

For all of these reasons, it is my expert opinion that First American followed standard industry custom in concluding that the Property had a right of access, and that the Department of Planning and Permitting's inquiry about the status of Waipa Lane did not invoke Covered Risk 4.

### B. The Policy Does Not Assure a Right of Vehicular Access

GS Industries asserts that the Policy insures that the Property enjoys a right of vehicular access. It is my expert opinion that the Policy does not assure that there is a right for a vehicle to travel to the Property.

My book explains to title insurance claims counsel that Covered Risk 4 has consistently been interpreted as not assuring that there is vehicular access to the insured parcel,[31] and that access coverage is not triggered if the access path is too steep for automobiles.[32] The policy

---

[28] FA000193.

[29] See FA000196 (regarding City's maintenance of the Privately-Owned Waipa Lane Segments).

[30] In *Sattler v. Philadelphia Title Ins. Co.*, 192 Pa. Super. 337, 162 A.2d 22 (1960), there was an undisclosed lien on the property, but no evidence that it would ever be enforced before it outlawed. The court said: "A title insurance policy is a contract of indemnity and not of guaranty. Unless and until a loss occurs, there is no liability." It ruled that the insured was not damaged unless and until the lien was enforced. Also see *Schwartz v. Stewart Title Guar. Co.*, 134 Ohio App.3d 601, 731 N.E.2d 1159 (Ohio App. 8 Dist. 1999), in which the title defect was asserted by the insured in a lawsuit he filed, but his title was not attacked by anyone else. The court said: "To trigger the duty to indemnify, the insured must have a claim asserted against the title by a third party because an 'indemnity is a … collateral promise to make good a loss or injury suffered by a policyholder in consequence of the act of a third party.' Burke, supra at § 2.1.1 at 2:4-2:5. In the case herein, we find no loss was actually sustained by the plaintiff." 134 Ohio App.3d. at 614, 731 N.E.2d at 1168. See also *First American Title Ins. Co. v. Hegedus*, 2013 WL 4077033 (D.Del.) (unpublished) (no coverage for rights of contract purchaser, as asserted by insured, when that purchaser was paid at closing and disclaimed any ownership of the property); *C & G Farms Inc. v. First American Title Ins. Co.*, 2018 WL 1281847 (Ariz.App. 1 Div.) (unpublished) (insurer owed no duty when insureds were found to hold good title to insured property and no one was attacking that title).

[31] *Title and Escrow Claims Guide,* § 9.7.1, *Sufficiency And Reasonableness Of Access Right*, citing, for example, *Riordan v. Lawyers Title Ins. Corp.*, 393 F.Supp.2d 1100, 1105 (D.N.M. 2005), which held that an insured has no reasonable expectation of vehicular access based on the basic policy access coverage.

[32] See *Title and Escrow Claims Guide,* § 9.7.2, *Effect of Private and Public Restrictions on Right of Access; see also Title and Escrow Claims Guide,* § 9.7.1, *Sufficiency And Reasonableness Of Access Right* at 9-70.

10

access coverage also does not assure that the access path has a road surface, or that the pathway is passable and unobstructed.[33] Covered Risk 4 has also consistently been found not to assure that there are no regulations or conditions on the use of the access drive or adjacent road.[34] The policy access coverage also does not assure that the roadway, if any, will be maintained by a government agency.[35] Thus, it is standard industry custom for a title insurer to conclude that the Policy does not assure a right of vehicular access.

My opinion is buttressed by the fact that an insured can obtain an assurance of vehicular access, by requesting and purchasing an ALTA 17 access endorsement. American Land Title Association promulgated the ALTA 17 endorsement in 2003.[36] That endorsement indemnifies against loss sustained by the insured if there is not "both actual vehicular and pedestrian access to" the street named in the endorsement. The endorsement also gives assurances about the public street: that it is physically open, publicly maintained and the insured has the right to use any existing curb cuts at the public street.[37]

Vehicular access can also be assured via the California Land Title Association 103.7 access endorsement. The ALTA Form 17 endorsement has also been described by the longtime chair of the ALTA Forms Committee, Mr. James Gosdin, as being a "significant improvement over" the CLTA 103.7 access endorsement because the CLTA form does not insure "the physical condition of" the street—that is, that there are any street improvements located in the area dedicated for street purposes. Mr. Gosdin notes that the ALTA 17 endorsement assures that the road has been built and is publicly maintained. However, he points out, the ALTA 17 coverage is not as broad as some would like, because it "does not insure which governmental entity maintains the street."[38]

Title insurers' underwriting instructions for the issuance of the ALTA 17 endorsement are consistent throughout the title insurance business. The ALTA 17 endorsement is only issued when the insured parcel directly abuts the identified public street, and that street is physically open and publicly maintained.

---

[33] *Title and Escrow Claims Guide,* § 9.7.1, *Sufficiency And Reasonableness Of Access Right* (collecting decisions including *Riordan v. Lawyers Title Ins. Corp.*, 393 F.Supp.2d 1100 (D.N.M. 2005) (holding that policy coverage was not invoked when insured was limited to hiking or horseback travel to his property via trail through federal forest, which access limitation was mandated by federal law); *Riffle v. United General Title Ins. Co.*, 64 Ark.App. 185, 984 S.W.2d 47 (1998) (holding that, although all overland access rights were invalid, hunting land that could be reached by boat was not valueless as claimed by insured); and *Green v. First American Title Ins. Co.*, 2005 WL 2249760 (Cal.App. Sept. 16, 2005) (unpublished).

[34] *Title and Escrow Claims Guide,* § 9.7.1, *Sufficiency And Reasonableness Of Access Right.*

[35] *Id.*

[36] See Clifford L. Morgan, *New Endorsement Forms Advance Industry*, Title News, American Land Title Association, Jan/Feb 2004. See also, John C. Murray, *New ALTA Commercial Endorsement Coverages (2003-2004)*, reprinted at the Title Law Annotated website, http://www.titlelawannotated.com/Insert_1.pdf.

[37] See John C. Murray, *New ALTA Commercial Endorsement Coverages (2003-2004)*, reprinted at the Title Law Annotated website, http://www.titlelawannotated.com/Insert_1.pdf.

[38] James L. Gosdin, *Title Insurance: A Comprehensive Overview*, p. 727.

Case 1:21-cv-00078-DKW-KJM   Document 24-9   Filed 11/01/21   Page 12 of 85   PageID #:
Case 1:21-cv-00078-DKW-KJM   Document 99-3   Filed 03/15/22   Page 13 of 19
                                        PageID.2092

The ALTA 17 endorsement, like other title insurance coverages, is offered on the premise that the insurer will pay a loss only if a statement in the endorsement turns out not to be true as of the Policy Date. The insurer and insured can determine in advance if the statements in the 17 endorsement are true or not true. Most commonly, the title officer reviews a survey to confirm that the insured parcel abuts the public road, and to identify that a roadbed exists and that there are no obstructions, gates or fences noted on the survey.[39] The underwriting for the endorsement is to make sure that every assurance is true, based on reliable information. If any statement in the ALTA 17 endorsement cannot be verified, that statement is removed from the endorsement issued with that policy.

GS Industries did not seek or pay for an ALTA 17 access endorsement. Thus, GS Industries asserts that the generic access coverage of the Policy impliedly grants a coverage that is provided in a standard form endorsement that the insured did not seek and for which it did not pay. I have been involved in many similar situations. It is my expert opinion that it is standard custom for a title insurer to deny a claim that the policy's generic access coverage assures vehicular access when the ALTA 17 or CLTA 103.7 endorsement were available but the insured did not seek or pay for such endorsements.

For all of the above reasons, it is my expert opinion that First American followed standard industry custom in concluding that the Policy does not assure that there is a right for a vehicle to travel to the Property.

C.  **The Policy Does Not Assure Ownership of the Privately-Owned Waipa Lane Segments**

GS Industries asserts that its access right over the Privately-Owned Waipa Lane Segments could be threatened by the owners of those parcels, and therefore First American was obligated to purchase an ownership interest in those parcels for the benefit of GS Industries. It is my expert opinion that the Policy does not contain such an assurance, and that First American followed standard industry custom by refusing to pay for the purchase of an additional parcel of land whose title was not insured in the Policy.

My book explains that the policy does not insure the title, or ownership of, any parcel lying outside the boundaries of the parcel(s) insured in Schedule A or C of the policy:

> The policy does not protect the insured against an attack on the title to land lying beyond the boundaries of the parcel described in the policy, or any rights the insured may have in adjacent lands.[40]

---

[39] For example, see page 15 of John C. Murray, *New ALTA Commercial Endorsement Coverages (2003-2004)*, reprinted at the Title Law Annotated website, http://www.titlelawannotated.com/Insert_1.pdf., which instructs the examiner to get this information from the survey.

[40] *Title and Escrow Claims Guide* § 8.2, *The Insured Land*, at 8-5 (footnotes and citations omitted).

12

As support for the above statement, I cite a number of court decisions that have so held.[41] In the same passage, I explain that the title insurer will not pay to acquire a parcel for the insured when the policy does not insure that the insured owns that parcel:

---

[41] In *Hawkins v. Weichert Title Agency*, 2011 WL 4466883 (N.J.Super.A.D.) (unpublished), a survey was presented at closing and that description was used in the policy. Later, a neighbor claimed some accreted land outside the boundaries of the insured parcel, and the insured sued the insurer claiming the policy insured him as owning that parcel. The court disagreed, saying that the neighbor "sought coverage to quiet title to property that falls outside the parcel of land insured in the title policy. The metes and bounds description in the title policy and the property survey clearly show that the adjoining property line between the Hawkins and their neighbors stops at a maple stump at the 'original high-water mark' of the lake." Likewise, in *Geiger v. Chicago Title Ins. Co.*, 2011 WL 3802724 (Wis.App.) (unpublished), the court ruled that the policy did not include additional land shown on a survey obtained by the insured after closing but not included in the policy description. Therefore, the insurer was not obligated to prosecute the insured's lawsuit to claim the additional land or to indemnify him when he "lost" the land. When neither the insured mortgage nor the policy included a second parcel, the insured properly did not seek compensation from the insurer for the lack of that parcel. *First Nat'l Bank of Northbrook, N.A. v. Stewart Title Guar. Co.*, 279 Ill.App.3d 188, 664 N.E.2d 310, 215 Ill.Dec. 913 (Ill.App. 1 Dist. 1996), rev.den. October 2, 1996 (Table, no. 81240). In *631 North Broad Street, LP v. Commonwealth Land Title Ins. Co.*, 2018 WL 4051798 (E.D.Pa. 2018) (unpublished), aff'd 2019 WL 3383878, 778 Fed.Appx. 164 (3rd Cir. (Pa.) 2019) (unpublished), the insurer was not required to defend its insured in a lawsuit about ownership of a portion of a wall located adjacent to the insured parcel, because the policy did not insure the title to the wall or the land on which it rested. The court buttressed its ruling with the survey exception. Further, the insurer was not "estopped" from denying coverage by having agreed to defend the neighboring owner, which was also an insured, because the wall *was* located on that insured's parcel. In *Pandora Distribution, LLC v. Ottawa OH, LLC*, ___ F.Supp.3d ___, 2019 WL 2924995 (N.D. Ohio 2019) (not yet released for publication), reconsid.den. 2019 WL 5729932, the court held that the insured received title to an aging overhead conveyor bridge spanning railroad tracks adjoining the warehouse that it bought, which allegedly reduced the value of the property. The court held that the policy did not insure the title to the conveyor bridge, and therefore the insurer was not required to pay a loss to its insured based on its claimed negative value. In *Irma Straus Realty Corp. v. Old Republic Nat'l Title Ins. Co.*, 184 A.D.3d 1095, 126 N.Y.S.3d 256, 2020 N.Y. Slip Op. 03307 (N.Y.A.D. 4 Dept. 2020), the insurer was not required to pay for an action filed by the insured to claim ownership of a stairwell that had not been built on the insured property, because the lawsuit did not invoke any Covered Risk. In *Rabinowitz v. Chicago Title Ins. Co.*, 14 Wash.App.2d 1018, 2020 WL 4783745 (Wash.App. 2 Div.) (unpublished), the insurer was not required to pay to defend the insured in a lawsuit over ownership of a ten-foot strip of land next to the insured land. The insureds argued that the policy made an assurance about the strip because it was excepted in the insureds' deed and in the legal description in Schedule A of the policy. The court said this proved the opposite point, that the strip was *excluded* from coverage: "Because the legal description in Schedule A contains identical language to the Rabinowitzes' deed, then Schedule A must also be interpreted as excluding the strip. Therefore, title would not vest "otherwise than as stated," because the title policy accurately described the Rabinowitz property, and this claim is not covered." The court also rejected the claim that the policy was "ambiguous" because the exception in the legal description was somehow vague. The court said the exception parcel was not vague, and that an "average person" could understand it to mean that ten-foot strip was not conveyed to the insureds. In *Shower Curtain Solutions Limited, LLC v. First American Title Ins. Co.*, 2020 WL 3393467 (Mich.App.) (unpublished), the court held that a reference to a street address in the policy was not an assurance of ownership in an adjoining alley that was not legally described in Schedule A. In *Tritapoe v. Old Republic Nat'l Title Ins. Co.*, 2020 WL 1487813 (W.Va.) (unpublished), the insurer was not required to defend its insured in a lawsuit brought by a neighbor after the insured blockaded a road that was near the insured parcel but not on it. In *Cummings v. Stewart Title Guar. Co.*, ___ F.Supp.3d ___, 2020 WL 6747977 (D. Idaho 2020) (permanent citation not yet available), the court dismissed an insured's claims against his title insurer about the "loss" of certain land because, in a prior lawsuit between the insured and the seller, the court ruled that the insured did not contract to buy the land at issue and the policy did not insure ownership of that land. In *Batstone v. Chicago Title Ins. Co.*, ___ F.Supp.3d ___, 2020 WL 6393164 (D.Md. 2020) (permanent citation not yet available), the insureds were sued by their neighbors for trespass because the insured parcel had been sloped to drain water onto the neighbor's land. The court found that none of the ALTA Homeowner's policy coverages cited by the insureds applied, because the lawsuit did not make any claim against the

13

Case 1:21-cv-00078-DKW-KJM   Document 24-9   Filed 11/01/21   Page 14 of 85   PageID #: 329
Case 1:21-cv-00078-DKW-KJM   Document 99-3   Filed 03/15/22   Page 15 of 19   PageID.2094

> The policy does not insure the title to or indemnify against the "loss" of land included in the purchase contract but that was not included in the policy or deed. An insured has no policy claim based on a parcel that was neither conveyed to the insured nor included in the title insurance policy. A title insurer does not contract to procure title on behalf of the insured by committing to insure the title that is conveyed to the insured. The insurer has no duty to defend or indemnify the insured as to a parcel claimed or owned by the insured that was not insured in the policy, including any land claimed or purchased after the policy date.[42]

I again cite numerous court decisions that have adopted the principles I recite in the above passage.[43]

It is also my expert opinion that First American accurately explained to GS Industries that the Policy did not assure any ownership rights in adjacent Waipa Lane because the Policy insures the title to the Land, and it defines Land as *not* including any rights in an adjoining street. My book makes exactly that statement:

---

insured Land or the Title to that Land, as those terms are defined in the policy. The court also based its conclusion on Exclusion 6 of the Homeowner's policy. The court said: "Quite simply, being prohibited or enjoined from encroaching upon a neighbor's property is not a limitation of one's own use of one's own property." A Michigan court reached a conclusion very similar to that in *Batstone*, in *Horwood v. North American Title Ins. Co.*, 2020 WL 7635765 (Mich.App.) (unpublished). In *Horwood*, the court said that none of the many Homeowner's policy Covered Risks cited by the insureds protected them against their trespass on their neighbor's land, including tearing up their fence and making rude gestures while driving across the land, because those assurances referred to and concerned the insured "Land." The lawsuit did not allege any issue with the title to the insured Land.

[42] *Id.* at 8-7 (footnotes and citations omitted).

[43] *Hoy v. Niemela*, 2013 WL 2926975 (Minn.App.) (unpublished) (although insured contracted to buy a garage condo unit and got possession of it, she had no claim on policy due to fact that deed did not include garage unit, which was not insured in policy); *Parahoo v. Mancini*, 1998 WL 180539 (Ohio App. 10 Dist.) (unpublished), rev.den. 83 Ohio St.3d 1416, 698 N.E.2d 1005 (1998) (involving parcel taken by condemnation after purchase contract was signed but before closing). The *Parahoo* court also found that the insurer had no duty to "provide a survey map that accurately described the size of the property conveyed or [to] explain the metes and bounds descriptions in the closing documents." Id. at 11. A nearly identical claimed duty to inform the insured was also rejected in *Hoy* and in *Kondaur Capital Corp. v. Fidelity Nat'l Title Ins. Co.*, 2013 WL 1908018 (Ariz.App. Div. 1) (unpublished). *Union Street Tower LLC v. First American Title Ins. Co.*, 42 Misc.3d 1229(A), 2014 WL 763233 (N.Y. Kings Cty. 2014) (unpublished) (insurer that insured building parcel but not air rights on parcel next door, because those rights were not conveyed, was not liable under policy or in tort for alleged failure to procure rights for insured); *Stewart Title Guar. Co. v. West*, 110 Md.App. 114, 676 A.2d 953 (1996). However, in *West*, because one of the parcels not conveyed or insured was to have provided the access to the property, the insurer owed the diminution caused by the lack of access. See *Union Street Tower LLC v. First American Title Ins. Co.*, 42 Misc.3d 1229(A), 2014 WL 763233 (N.Y. Kings Cty. 2014) (unpublished) (insurer that insured building parcel but not air rights on parcel next door, because those rights were not conveyed, was not liable under policy or in tort for alleged failure to procure rights for insured). In *Casero v. Chicago Title Ins. Co.*, 2018 WL 830225 (D.Md.) (unpublished), the insureds recorded a deed to themselves, five years after the policy, altering their boundary to include more land. The court found that the insurer had no duty to defend the lawsuit brought by the neighbor to contest title to the land claimed in the post-policy deed.

14

ALTA policies state that they do not insure any rights in adjacent streets, or any rights beyond the parcel shown in the policy. Most ALTA policies make this statement in the definition of "Land."[44]

Further, GS Industries based its assertion on the Texas decision of *Clements v. Stewart Title Guar. Co.*, 537 S.W.2d 126 (Tex.Civ.App.-Austin 1976), writ ref'd n.r.e. However, in that case, the court held that a policy insured an easement because Schedule A described the insured land by reference to a deed which included the easement grant. By contrast, Schedule C of the Policy included no affirmative assurance about, or reference to, the Privately-Owned Waipa Lane Segments.

My expert opinion is also buttressed by the fact that a title insurance policy can be written to give additional specific assurances concerning the access right that benefits the insured parcel, but that no such additional assurances are contained in the Policy. Such additional affirmative access coverage is most commonly done by reciting a specific access right in Schedule A or C of the policy, as my book explains:

> The policy may recite an access easement in Schedule A, which causes the policy to indemnify the insured in the event the easement is invalid or unenforceable for the benefit of the insured parcel. When the policy insures an access easement in Schedule A, the fact that the property has other access does not negate the covered risk, but may significantly reduce the amount of the loss, which is measured as the diminution in value caused by the lack of the easement.[45]

The Policy contained no affirmative insurance of any right in the Privately-Owned Waipa Lane Segments, including any right of access over those parcels. Nor could the Policy have included such an assurance, because GS Industries did not receive a conveyance of any such right.

Rather, GS Industries repeatedly asked First American to *obtain* an ownership interest for the benefit of the Property that did not exist on the Date of Policy. As the above passages of my book explain, a title insurance policy insures title that is vested in the insured by the deed to the insured. The Policy indemnifies the insured if the title to the insured parcel fails. The Policy *does not* insure that the insured owns rights that were never even purportedly conveyed to it.

My expert opinion is further buttressed by the fact that, even if GS Industries had sought and paid for an ALTA 17 endorsement, it would not have obtained an assurance that it was the owner of the Privately-Owned Waipa Lane Segments. An ALTA 17 endorsement does not grant any assurance about the ownership of the abutting public road identified in the endorsement. The endorsement assures only that the insured parcel enjoys a right to travel over the named adjoining street for access, not that the insured owns the roadway property. Thus, even that endorsement would not have assured GS Industries that it was one of the owners of the Privately-Owned Waipa Lane Segments. GS Industries again asserts that the generic access coverage of

---

[44] *Title and Escrow Claims Guide* § 8.8, *Appurtenant Easements And Rights*, at 8-24.

[45] *Title and Escrow Claims Guide* § 9.7, *Right of Access*, at 9-57 (footnotes and citations omitted).

15

the Policy impliedly grants a coverage that is not even found in the augmented access coverage that can be obtained through the ALTA 17 endorsement.

Finally, my expert opinion is supported by the fact that no court has ever ruled or even suggested that a title insurance policy insures that the insured owns the fee simple title to a roadway that abuts the insured parcel.

For all of the above reasons, it is my expert opinion that the Policy does not assure that GS Industries owns any part of the Privately-Owned Waipa Lane Segments and thus First American followed standard industry custom and practice in refusing GS Industries' demand that the insurer purchase that ownership interest for its benefit.

### D. A Title Insurer Does Not Pay Development Delay Damages

GS Industries also alleges that First American is obligated to pay it for various types of expenses it claims it will incur due to a delay in its tenant's plans to convert the Property to apartment buildings. It is my expert opinion that First American followed standard industry custom in refusing to pay any such claimed losses.

First, it is my expert opinion that there has been no delay caused by First American. The City of Honolulu asked the Church for information about Waipa Lane. The City withdrew that request several months later, because it determined that Waipa Lane is considered to be a public road. Nothing that First American did or did not do, in responding to GS Industries' policy claim, caused any delay in the permit approval process.

Further, at no time was access to the Property blocked. The claimed delay expenses relate to development of the Property by the tenant Church, not to a matter for which the Policy provides coverage.

In addition, it is customary for a title insurer not to pay the insured money as if delay of development plans were a loss payable under the Policy. The Policy is very clear in stating that the sole and entire loss payable to the insured is the reduction in the property's value caused by the matter for which there is coverage.[46] The Policy contains no formula for computing "delay" losses, such as a *per diem* loss for days on which the insured is deprived of the use of the insured property due to a matter for which there is policy coverage. Thus, it is standard industry custom for a title insurer not to pay any alternate or additional forms of loss. This custom is derived in part from the court decisions that have construed the policy. Courts have rejected the argument by insureds that diminution in value, as described in the Policy, is merely one *element* of loss, holding instead that the difference value is the *sole and entire* measure of loss payable by the title insurer.[47] My book says:

---

[46] Condition 8(a) says: "(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the lesser of (i) the Amount of Insurance; or (ii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy."

[47] In *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622 (5th Cir. (La.) 2013), the court interpreted an ALTA owner's title insurance policy. The insured argued that diminution in value

16

The title insurer is not liable for payment of the insured's ownership costs for the real estate, such as taxes and debt service, during the time in which the insurer is paying to clear title. As one court explained, such expenses are not losses incurred due to a title defect, but rather are ordinary costs of ownership… .[48]

Further, this principle is explained in a respected text on title insurance, James Gosdin's *Title Insurance: A Comprehensive Overview*.  Mr. Gosdin says this about such claims for additional elements of damage as claimed losses under the title insurance policy:

Consequential damages are generally not recoverable under the 1970 ALTA Owner's Policy and are not recoverable under the contractual provisions of the Owner's Policy under any circumstances. … Absent proof that a defect insured against resulted in carrying costs, the carrying costs, such as interest, taxes, and mortgage payments, are not compensable under the title policy.  Similarly, the insured may not recover the value of the use of the land lost during litigation, even though the litigation resulted in recognition of restrictions and payment to the insured of the reduction in value of the land.  The title insurer is not liable for interim damages because of a defect.  … Loss does not include carrying charges and the lost time value of foreclosure proceeds incurred during the period of title priority litigation successfully defended by the title insurer.[49]

Thus, it is my expert opinion that a title insurer customarily rejects any demand for "delay" losses, and courts have likewise rejected such claims.[50]

## IV.   Report Preparation and Compensation

I am paid $350 per hour.  My expenses are reimbursed at cost.  My compensation is not contingent on my opinions or on the outcome of the litigation.  I personally prepared this report.  My signature is affixed below.

---

was merely one element of the loss payable. The court agreed with the title insurer that diminution in value is the entire and sole measure of loss.

[48] *Title and Escrow Claims Guide* § 3.4.9.2, *Carrying Expenses*, at p. 3-182 (footnotes and citations omitted).

[49] James L. Gosdin, *Title Insurance: A Comprehensive Overview*, Third Edition, pp. 305-306.

[50] See *Title and Escrow Claims Guide* § 3.4.9.1, *Lost Rent*; § 3.4.9.2, *Carrying Expenses*; and § 3.4.9.3, *Construction Expenses*.

Case 1:21-cv-00078-DKW-KJM   Document 24-9   Filed 11/01/21   Page 18 of 85   PageID #: 323
Case 1:21-cv-00078-DKW-KJM   Document 99-3   Filed 03/15/22   Page 19 of 19
PageID.2098

Dated this 30th day of September, 2021.

                                      Yours very truly,

                                      J. Bushnell Nielsen

45911810

Appendix enclosed